IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA19-372

 Filed: 3 December 2019

Catawba County, No. 16 CRS 1556

STATE OF NORTH CAROLINA

 v.

ANTONIO MORQUETT PHILLIPS

 Appeal by defendant from judgment entered 31 August 2018 by Judge William

A. Wood II in Catawba County Superior Court. Heard in the Court of Appeals 30

October 2019.

 Attorney General Joshua H. Stein and Chief Deputy Attorney General
 Alexander M. Peters for the State.

 The Epstein Law Firm PLLC, by Drew Nelson, for defendant-appellant.

 TYSON, Judge.

 Antonio Morquett Phillips (“Defendant”) appeals from the jury’s conviction of

statutory rape of C.C., a 13-year-old female. See N.C. R. App. P. 42(b)(3) (initials are

used instead of a minor’s name in appeals filed under N.C. Gen. Stat. § 7A-27

involving sexual offenses committed against a minor). We find prejudicial error, and

reverse and remand for a new trial.

 I. Background
 STATE V. PHILLIPS

 Opinion of the Court

 C.C., then 13 years old, and her friend Justine Eckard, then 21 years old, were

at Defendant’s apartment on the evening of 8 December 2013. The first trial resulting

from the events of that evening ended in an acquittal on some charges and a mistrial

on this charge. At a second trial, C.C., Eckard, and Defendant each testified to

different versions of how the three individuals arrived at Defendant’s apartment, how

they left, and what happened while all three were there and afterwards.

 A. C.C.’s Testimony

 C.C. testified she and Eckard walked to a McDonald’s restaurant to access the

restaurant’s wireless internet. They encountered Defendant there and he invited

them back to his apartment. Eckard knew Defendant and told C.C. “it was a good

idea.” C.C. had previously met Defendant once before, and she trusted Eckard.

Defendant drove both of them to his apartment. They entered through the back door.

Defendant and C.C. smoked marijuana, while the three of them talked.

 C.C. smoked “too much” marijuana, which caused her to “get really relaxed”

and “take down [her] guard.” Eckard had to leave the apartment around 9:00 p.m.,

Defendant called her a cab, and she left. C.C. was interested in staying with

Defendant and smoking more marijuana. C.C. relied upon Eckard and “knew she

wouldn’t leave me in a situation that I wouldn’t be okay in.”

 Defendant told C.C. that “he wanted to treat [her] like a real man.” He bent

her over and initiated sexual contact with her after Eckard had left. C.C. told

 -2-
 STATE V. PHILLIPS

 Opinion of the Court

Defendant she “was not comfortable with things that he did to [her].” Defendant

penetrated C.C. anally, orally, and vaginally. C.C. did not remember if Defendant

ejaculated, but she assumed he did when he finished.

 Defendant then gave C.C. a black tank top he owned, called a cab for C.C., and

she left. C.C. told her mother she had been raped when she arrived home. Her

mother called the police, who responded. Paramedics also arrived and transported

C.C. to Frye Regional Medical Center. C.C. testified she had no sexual contact with

Eckard or any other person other than Defendant while at his apartment.

 B. Eckard’s Testimony

 Eckard testified she and C.C. had walked to McDonald’s “trying to find

something to do.” C.C. had Defendant’s phone number and had the idea to contact

him. Eckard agreed they should send Defendant a text message and go to his

apartment. Defendant picked them up and drove them to his apartment. They

entered through the front door. Eckard played a game on her phone and listened to

music, while C.C. and Defendant smoked marijuana. Eckard wanted to leave and get

home to comply with her mother’s curfew. She left Defendant’s apartment around

9:30 or 10:00 p.m. in a cab he had called for her. Although Eckard testified she had

“begged” C.C. to leave with her, C.C. chose to stay behind. Eckard also testified she

had no sexual contact with Defendant or with C.C. that night.

 C. Defendant’s Testimony

 -3-
 STATE V. PHILLIPS

 Opinion of the Court

 Defendant, age 36 at the time of the incident, testified he first saw C.C. and

Eckard walking up the sidewalk from his front porch. He had neither seen them at

McDonald’s, nor picked them up, and had not driven them to his apartment.

Defendant had not received a text message from them “because neither one of them

[had] my number.” On Defendant’s porch, he and C.C. smoked marijuana while

Eckard “play[ed] a little game on her phone.”

 Eckard repeatedly asked Defendant for money, which irritated him, until he

asked her what she was going to do for the money. She said she would make it “worth

[his] while.” Eckard and Defendant walked into the apartment, leaving C.C. outside

on the porch. Eckard then performed oral sex on Defendant. Defendant ejaculated

during his contact with Eckard and went into the restroom to take a shower. When

he left the restroom, he found both Eckard and C.C. laying on his bed. Defendant

saw Eckard’s face and hands between C.C.’s legs, with Eckard’s finger “inside [C.C.]”

 Defendant “snapped” and asked them what they were doing. Eckard asked for

her money, which Defendant gave her. He told them to get their stuff together and

leave. Eckard and C.C. left together. Defendant then saw C.C. walking back up the

street by herself. When Defendant asked her what she was doing, she said she needed

a ride home. Defendant called her a cab and she left. Defendant denied any sexual

acts or contact with C.C.

 -4-
 STATE V. PHILLIPS

 Opinion of the Court

 Defendant’s testimony at trial conflicted with previous statements he had

made to police during the investigation. During an interview with an investigator,

Defendant initially claimed he did not know “whether [C.C.] was legal or not,” but at

trial he admitted he knew C.C. was thirteen years old. He initially claimed neither

C.C. nor Eckard had entered into his apartment that night but had entered only the

building. When his DNA sample was taken, he insisted investigators would

“absolutely not” find his DNA in C.C.’s rape kit.

 D. DNA Evidence

 C.C. presented at the hospital in the same condition as she had arrived home,

because her mother did not allow her to change clothes, shower, wash, or use the

bathroom. A sexual assault nurse examiner collected a rape kit and examined C.C.

“head to toe.” She took oral, vaginal, and anal swabs from C.C., and gathered all of

C.C.’s clothing.

 Dr. Melinda Wilson, a forensic biologist with the North Carolina State Crime

Lab, qualified as an expert witness in the area of DNA analysis, and testified at trial.

She received DNA profiles from C.C., Defendant, and Eckard, and tested C.C.’s

clothes and swabs for DNA.

 The DNA testing process takes multiple steps. Dr. Wilson testified she

extracted DNA from very small samples of the evidence, quantified how much DNA

was potentially present in each sample, made “billions and billions and billions of

 -5-
 STATE V. PHILLIPS

 Opinion of the Court

copies” of each sample to improve visibility, and then created a graphical

electropherogram (“graph”) of each unknown donor sample to compare with the

known donor samples. Because DNA is microscopic and not visible to the human eye,

the graphs represent between fifteen and twenty-seven locations on the DNA

molecule in each person’s DNA, “kind of like an address.” At each location on the

graph, Dr. Wilson sees a number representing an “allele,” which she testified “is a

result that I would see as part of a DNA profile.” Each graph is representative of a

DNA profile that comes either from an unknown sample of evidence or a known

sample profile.

 Dr. Wilson testified a DNA “match” occurs when the alleles at every location

on an unknown sample are the same as all twenty-seven of the locations she views

on a known sample. If every location is not tested, there cannot be a “match.” If not

all the locations are tested, but all tested locations are the same, the unknown sample

is “consistent with” the known sample, which Dr. Wilson testified “is not an

exclusion.” An “exclusion” is the result when the unknown sample evidence “could

not come from the known standard” in the comparison.

 A DNA profile is “conclusive” when it is of sufficient quality and quantity for

comparison purposes, and “inconclusive” when it is not. Dr. Wilson testified, when a

component is inconclusive, “you cannot include someone as a possible source of DNA

and you also cannot exclude them as a possible source of DNA.”

 -6-
 STATE V. PHILLIPS

 Opinion of the Court

 One of the five samples Dr. Wilson tested, C.C.’s external genitalia swab,

contained a “mixture of three contributors”: two “major” contributors and one “minor.”

Dr. Wilson presumed C.C. was one of the major contributors as the donor of the

sample and determined Defendant’s DNA profile was consistent with the other major

contributor. The minor contributor’s profile was “inconclusive due to complexity

and/or insufficient quality of recovered DNA.”

 The prosecutor then asked Dr. Wilson if she was “able to see anything” about

that minor contributor’s profile. Dr. Wilson answered:

 No. So when a profile is inconclusive, we are not allowed
 by policy to make a comparison, period. So I can’t look at
 it and say, well, this alleles that are there, or results that
 are there in that profile, look like it’s this other person. You
 can’t do that. So it’s just is what it is. It’s inconclusive and
 we don’t make comparisons to it and don’t make
 statements about it.

After a few questions about alleles, the prosecutor continued to ask Dr. Wilson to

make statements about the inconclusive minor contribution:

 Q: Okay. And were you able to see any alleles in that minor
 profile?

 A: I did see alleles.

 Q: How many did you see?

 A: Six.

 Q: Six alleles?

 A: Uh-huh (Affirmative).

 -7-
 STATE V. PHILLIPS

 Opinion of the Court

 Q: Okay.

 A: Yes.

 Q: And looking at those six alleles, were you able to look at
 Justine Eckard’s alleles at those same markers and
 determine if she happened to have any of those same alleles
 as those same markers?

 A: No; because that’s against policy because it’s
 inconclusive.

 Q: Okay. If I asked you to look at those, are you able to do
 it here?

 A: If made to do so, yes.

Defendant’s counsel objected, but was overruled.

The prosecutor continued:

 Q: Unfortunately, Ms. Wilson, I’m making you do that.

 A: Okay.

 Q: If you could tell me at those same markers if any of those
 alleles are the same or different.

 A: Okay. I’m going to do this and I'm going to preface this
 with this is not scientifically accurate, so what I’m about to
 do, we do not do at the State Crime Lab, the FBI does not
 do it. No lab in this country, I’m assuming most labs in the
 world, do not do this because it’s inconclusive. So you
 cannot make a conclusion on an inconclusive component
 regardless of whether the alleles are the same, that’s not a
 match; if they’re different, it’s not an exclusion.

 -8-
 STATE V. PHILLIPS

 Opinion of the Court

 After Dr. Wilson’s preface, the court excused the jury sua sponte. The trial

court asked Defendant’s counsel: “you objected and I overruled your objection. Would

you like to be heard?” Defendant’s counsel argued, inter alia:

 [Dr. Wilson] stated that this is not procedure; this is not
 anything that anyone can follow; that it’s not anything that
 anyone would use, but he can make her make this
 comparison.

 So I don’t know. Absent at least an offer of proof as
 to what's going to come forward, Your Honor, and then you
 make your ruling because I don’t know what’s about to
 come on this. . . . [T]his is new science and this is not
 accepted science so to me, I don’t understand -- I mean, I
 don’t think that it’s going to -- it doesn’t meet the
 standards.

 The prosecutor responded, inter alia:

 What I’m about to do is . . . because the sample is
 not, for lack of a better term, not a good sample, they’re not
 able to make any conclusions whether it is or isn’t
 somebody. But just because it’s not a good sample doesn’t
 mean they can’t see certain things, and what they’re seeing
 is scientif -- is what they’re seeing. It is reliable. It’s based
 on science.

 So when she says she sees these alleles, she sees
 those alleles. But because the sample is so . . . minimal or
 not a good sample or not scientifically a good sample, they
 don’t want to render an opinion. She’s not going to render
 an opinion as to whether this is or is not someone. But
 what she can do is look to see if the alleles there do or do
 not match the alleles for any individual I ask her to do it.

 The reason why I asked her to do it with Justine
 Eckard is you know in the last trial [Defendant’s counsel]
 argued with the samples that were inconclusive that this

 -9-
 STATE V. PHILLIPS

 Opinion of the Court

 could possibly be Justine Eckard. Justine Eckard’s saliva,
 that’s what that is, ladies and gentlemen.

 I think I have a right, knowing that that happened
 in the other trial, to somehow try to show that that’s
 unlikely. And I think it’s up to the jurors to determine,
 based on the caveats that Ms. Wilson will give, as to
 whether or not it’s possible. And Ms. Wilson will say she’s
 not giving any opinion, so if there is a possibility -- but we
 look and what we see are three of those alleles are not, are
 not, Justine Eckard. And Justine Eckard has been
 excluded from almost every other place.

 That’s information I think they need to know. If I’m
 not able to present that, then that allows her to argue that
 that could be Justine Eckard without me arguing no, I don’t
 think it is because what we see on there, even though it’s
 not the most scientific thing, what we’re able to see, my
 argument is, doesn’t show that it’s Justine Eckard.

 And I just think that's fair.

 The trial court then asked the witness for a proffer of the contested testimony.

The prosecutor asked Dr. Wilson to clarify if any of what he had just said was

inaccurate. Dr. Wilson answered:

 The samples -- all I can say about the samples . . . is,
 you see results that don’t match someone. I don’t know
 that because I don’t make the comparison because per
 policy I’m not allowed to, period.

 So we have to be very careful in doing this, so I have
 to preface to the jury, this is not something -- I would be in
 big trouble if I did that in the Lab. I’m not allowed to do
 this. So I don’t want them to think that just because three
 alleles are not the same that it’s an exclusion because it’s
 not.

 - 10 -
 STATE V. PHILLIPS

 Opinion of the Court

 I know like it sounds like it would be and it’s a hard
 concept to understand, but it’s not an exclusion and it’s also
 not inclusion.

 The court requested Dr. Wilson’s proffer be taken as voir dire. In response to

a question about “seeing” the minor contributor’s alleles, Dr. Wilson again explained:

 Yes. So it’s real DNA. It’s not that it’s not real DNA. It’s
 absolutely real DNA. . . . It’s a person but we don’t know
 who it is. You can’t include; you can’t exclude.

 ...

 I hate to keep beating a dead horse, but the scientific
 community does not do this. We do not do it. It’s not just
 our Lab. The FBI doesn’t do it. The forensic community as
 a whole cannot make comparisons because it’s not that
 they're unreliable or that it’s inaccurate information, it’s
 just some may be missing, and with sampling, meaning if I
 run this sample several times, the three results that don’t
 match could pop up and match.

 So every time you run the sample you get a different
 answer, and in validation studies that we do,
 developmentally at the company that creates the kits we
 use and also in-house at the Lab, has shown over and over
 and time and time again, you cannot include or exclude
 from these.

 The prosecutor stated he would not ask Dr. Wilson to render an opinion, “but

you can look at those six alleles and determine if any of those alleles match any profile

that you have on file; is that correct?” Dr. Wilson replied: “I can if you ask me to, yes.

But that’s why I prefaced it with I want them to understand this is not a match; it is

not an exclusion. It is not anything. It is real DNA that’s there and I can’t say a

thing about it.”

 - 11 -
 STATE V. PHILLIPS

 Opinion of the Court

 The prosecutor led Dr. Wilson through the comparison of the six alleles of the

minor contributor with Eckard’s profile. Dr. Wilson testified that three of the alleles

were the same as Eckard’s profile, and three were different. The prosecutor

reiterated that Dr. Wilson was not rendering any opinion and was just stating facts

about the alleles.

 Defendant’s counsel restated Dr. Wilson’s testimony and asked one question

emphasizing an analogy Dr. Wilson had used, that the evidence was like seeing two

people clearly standing under a street light and a third dimly in the shadows: “there

are three people on that street corner?” Dr. Wilson answered, “That’s correct.”

Defendant’s counsel asked no further questions.

 The prosecutor asserted:

 Your Honor, the State is asking her to say what is there.
 We’re not asking her to do anything different; we’re not
 preventing her from saying any caveats. We’re being
 candid with this jury of what this is. But I think the jury
 has a right to know fully everything what is there; what
 can we see from that. That’s all I’m doing.

 After discussion of discovery materials provided on this issue, the court asked

Defendant’s counsel if she wished to be heard any further on the minor contributor’s

alleles. Defendant’s counsel replied, “No, Your Honor, not as far as that. I mean,

that I have a fairly good understanding of.” After further voir dire of another issue,

the trial court issued its ruling: “With regard to the defendant’s objection to the

 - 12 -
 STATE V. PHILLIPS

 Opinion of the Court

testimony about the alleles being present or absent from the mixture that the witness

was observing, that will continue to be overruled.”

 The jury returned and Dr. Wilson’s testimony resumed. Dr. Wilson testified,

without further objection by Defendant’s counsel, “three of the six total alleles that I

see in the minor component of the external genitalia swabs, Justine Eckard shares

three of them and three she does not have.” The prosecutor, “in all fairness,” asked

Dr. Wilson to confirm, “[what] we’re talking about with the six is an inconclusive

[component]?” Dr. Wilson answered, “That’s correct. Yes.”

 The jury returned a verdict finding Defendant guilty of statutory rape of a 13-

year-old. The court sentenced Defendant to a term of imprisonment of 420 to 564

months. Defendant gave notice of appeal in open court and also in a timely filing.

 II. Jurisdiction

 An appeal as of right lies with this Court pursuant to N.C. Gen. Stat. § 7A-

27(b)(1) (2017).

 III. Issues

 Defendant argues the trial court erred by requiring Dr. Wilson to compare and

contrast the DNA profile of the minor contributor with Eckard’s DNA profile.

Defendant argues this testimony was inadmissible under N.C. R. Evid. 702(a) and

N.C. R. Evid. 403. Alternatively, Defendant argues the trial court committed plain

error by allowing this testimony.

 - 13 -
 STATE V. PHILLIPS

 Opinion of the Court

 Defendant also argues the testimony was misleading and had a material

impact on the verdict. Lastly, Defendant argues the State deprived him of due

process by presenting misleading testimony.

 IV. Preservation

 The State argues Defendant waived the issues presented on appeal by not

objecting to the challenged testimony in either a timely or specific manner when it

was presented to the jury. “In order to preserve an issue for appellate review, a party

must have presented to the trial court a timely request, objection, or motion, stating

the specific grounds for the ruling the party desired the court to make if the specific

grounds were not apparent from the context.” N.C. R. App. P. 10(a)(1).

 Generally speaking, the appellate courts of this state will
 not review a trial court’s decision to admit evidence unless
 there has been a timely objection. To be timely, an
 objection to the admission of evidence must be made at the
 time it is actually introduced at trial. It is insufficient to
 object only to the presenting party’s forecast of the
 evidence.

State v. Ray, 364 N.C. 272, 277, 697 S.E.2d 319, 322 (2010) (citations and internal

quotation marks omitted).

 In Ray, the defendant objected “only during a hearing out of the jury’s

presence. In other words, [the] defendant objected to the State’s forecast of the

evidence, but did not then subsequently object when the evidence was actually

introduced at trial.” Id. (citation omitted). Our Supreme Court held such an objection

 - 14 -
 STATE V. PHILLIPS

 Opinion of the Court

was not timely and failed to preserve for appellate review the trial court’s decision to

admit the contested evidence. Id.

 The State’s reliance upon Ray and other similar cases is misplaced.

Defendant’s first objection was made in the jury’s presence. Defendant’s counsel

objected after Dr. Wilson testified she could only answer the State’s questions about

the comparison of the minor contributor to Eckard’s profile “[i]f made to do so.” This

objection was made and overruled on the record and in the presence of the jury.

 After Dr. Wilson’s subsequent, extensive preface quoted above, the trial court

paused the line of questioning, excused the jury sua sponte, and asked Defendant’s

counsel if she would like to be heard on the overruled objection. After extensive

discussion and further objections by Defendant during the voir dire, the trial court

held Defendant’s objection would “continue to be overruled,” confirming the

discussion and ruling related back to the first objection. Defendant’s objection was

timely made, renewed and preserved for appellate review.

 The State also argues Defendant’s counsel did not state the specific grounds

for the objection, as is required by Rule 10. The Rules only require specific grounds

if “not apparent from the context.” N.C. R. App. P. 10(a)(1). At the end of the

discussion out of the jury’s presence, the trial court specifically stated it was ruling

on Defendant’s “objection to the testimony about the alleles being present or absent

from the mixture that the witness was observing.” These specific grounds were

 - 15 -
 STATE V. PHILLIPS

 Opinion of the Court

apparent from the context. Defendant’s counsel’s argument during the voir dire

discussion that the proffered testimony would not “meet the standards” of “accepted

science” further specifies the grounds for the objection.

 Defendant’s objection to Dr. Wilson’s testimony about the minor contributor’s

alleles was timely made and the specific grounds were apparent from the context.

The Rule 702 objection is preserved. At oral argument, Defendant’s counsel conceded

both the Rule 403 and constitutional due process issues were not objected to at trial

and were not preserved for appellate review, even for plain error or harmless error.

 V. Standard of Review

 A trial court’s ruling on Rule 702(a) is reviewed for abuse of discretion. State

v. McGrady, 368 N.C. 880, 893, 787 S.E.2d 1, 11 (2016). “A trial court may be reversed

for abuse of discretion only upon a showing that its ruling was manifestly

unsupported by reason and could not have been the result of a reasoned decision.”

State v. Riddick, 315 N.C. 749, 756, 340 S.E.2d 55, 59 (1986) (citations omitted).

 When the issue is whether “the trial court’s decision is based on an incorrect

reading and interpretation of the rule governing admissibility of expert testimony,

the standard of review on appeal is de novo.” State v. Parks, __ N.C. App. __, __, 828

S.E.2d 719, 725 (2019) (citation omitted).

 VI. Analysis

 - 16 -
 STATE V. PHILLIPS

 Opinion of the Court

 Defendant argues Dr. Wilson’s testimony concerning the minor contributor’s

alleles violated Rule 702(a). The State argues Dr. Wilson’s testimony was not

improper scientific expert opinion testimony and was beyond the scope of Rule 702(a).

Alternatively, the State argues the trial court did not abuse its discretion by

admitting the testimony because any error to Defendant was not prejudicial.

 A. Scope of Rule 702(a)

 Rule 702(a) allows for testimony by qualified experts “in the form of an opinion,

or otherwise” if “scientific, technical or other specialized knowledge will assist the

trier of fact to understand the evidence or to determine a fact in issue.” N.C. Gen.

Stat. § 8C-1, Rule 702(a) (2017). “In order to assist the trier of fact, expert testimony

must provide insight beyond the conclusions that jurors can readily draw from their

ordinary experience.” McGrady, 368 N.C. at 889, 787 S.E.2d at 8 (citation and

internal quotation marks omitted).

 By contrast, lay testimony is “rationally based on the perception of the

witness.” N.C. Gen. Stat. § 8C-1, Rule 701 (2017). Lay witnesses may state

“instantaneous conclusions of the mind as to the appearance, condition, or mental or

physical state of persons, animals, and things, derived from observation of a variety

of facts presented to the senses at one and the same time.” State v. Broyhill, 254 N.C.

App. 478, 485, 803 S.E.2d 832, 838 (2017) (emphasis original) (quoting State v. Leak,

156 N.C. 643, 647, 72 S.E. 567, 568 (1911)).

 - 17 -
 STATE V. PHILLIPS

 Opinion of the Court

 “[W]hen an expert witness moves beyond reporting what he saw or experienced

through [her] senses, and turns to interpretation or assessment to assist the jury

based on his specialized knowledge, [she] is rendering an expert opinion.” State v.

Davis, 368 N.C. 794, 798, 785 S.E.2d 312, 315 (2016) (citation and internal quotation

marks omitted). “[D]etermining what constitutes expert opinion testimony requires

a case-by-case inquiry in which the trial court (or a reviewing court) must look at the

testimony as a whole and in context.” Id.

 The State argues Dr. Wilson’s testimony concerning the objected-to testimony

was not expert opinion testimony, because she was not asked to render an opinion,

but only to state what alleles she could “see” in the minor contribution. We disagree.

Although Dr. Wilson testified to the alleles she “saw,” she made clear in her testimony

that DNA is invisible to the human eye. The alleles she “saw” were numbers on the

graphs she had prepared, using her expertise and experience as a forensic scientist.

Her testimony moved beyond reporting what she had seen through her senses and

turned to assessment and analysis based on her specialized knowledge. Despite the

State’s careful framing, and the State’s argument otherwise, she was asked and

rendered expert opinion testimony and interpretations subject to the requirements of

Rule 702(a).

 B. Requirements of Rule 702(a)

 - 18 -
 STATE V. PHILLIPS

 Opinion of the Court

 Under Rule 702(a), expert opinion testimony must be “based upon sufficient

facts or data[,] the product of reliable principles and methods,” and the expert witness

must “appl[y] the principles and methods reliably to the facts of the case.” N.C. Gen.

Stat. § 8C-1, Rule 702(a)(1)-(3). Dr. Wilson’s testimony regarding the minor

contributor’s alleles was neither based upon sufficient facts or data nor was the

product of reliable principles and methods. As an admitted expert witness, she even

testified to this absence or omission of reliability herself.

 Dr. Wilson testified the minor contributor’s profile was “inconclusive due to the

complexity and/or insufficient quality of recovered DNA.” She also testified an

“inconclusive” profile is not of sufficient quality and quantity for comparison

purposes. By repeatedly asking Dr. Wilson to break with the State Lab’s policy and

established scientific procedures and testify to the alleles she could see in the minor

contributor’s graph, the State asked Dr. Wilson to give expert opinion testimony

based upon admittedly insufficient facts or data in violation of the first prong of Rule

702(a).

 The testimony also violated the second prong of Rule 702(a). Dr. Wilson

further disclaimed, repeatedly, that the testimony she was required to give was “not

scientifically accurate.” The State’s request was not something done by the State

Crime Lab, the FBI, any “lab in the country,” or “most labs in the world.” Given her

strenuous preface, this testimony cannot reasonably be considered the product of

 - 19 -
 STATE V. PHILLIPS

 Opinion of the Court

reliable principles or methods. Id.; see also McGrady, 368 N.C. at 884, 787 S.E.2d at

5 (the 2011 amendments to N.C. R. Evid. 702(a) adopted the federal standards

articulated in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 125 L. Ed. 2d 469

(1993) and other cases).

 The challenged testimony, describing the alleles of the minor contributor, was

neither “based upon sufficient facts or data” nor “the product of reliable principles

and methods.” N.C. R. Evid. 702(a)(1)-(2). The trial court erred in allowing and

admitting this testimony over Defendant’s objection.

 C. Prejudice to Defendant

 [E]videntiary error does not necessitate a new trial unless
 the erroneous admission was prejudicial. A defendant is
 prejudiced by evidentiary error when there is a reasonable
 possibility that, had the error in question not been
 committed, a different result would have been reached at
 the trial out of which the appeal arises.

State v. Wilkerson, 363 N.C. 382, 415, 683 S.E.2d 174, 194 (2009) (citations and

internal quotation marks omitted), cert. denied, 569 U.S. 1074, 176 L. Ed. 2d 73

(2010). Prejudicial error will not be found if the other unchallenged and properly

admitted evidence presented by the State against Defendant is overwhelming, or the

evidence erroneously admitted is of “relative insignificance.” Id.

 The State argues the other unchallenged and properly admitted evidence in

this case overwhelmingly proves Defendant’s guilt to overcome any prejudice. The

State notes Defendant did not challenge Dr. Wilson’s testimony regarding her

 - 20 -
 STATE V. PHILLIPS

 Opinion of the Court

analysis of the other DNA samples. A review of that testimony shows Dr. Wilson

reported her analysis of five samples:

 1. In the rectal swab, she found two fractions of DNA: one was a sperm

 fraction, with a mixture of two contributors. Dr. Wilson presumed C.C. was

 one of the sources, as the known donor of the sample. After removing her

 contribution, the “derived component” was consistent with Defendant’s

 profile. The non-sperm fraction was consistent with a mixture of two

 contributors. Dr. Wilson was able to match C.C. with the predominant

 contributor to that fraction, but could make no conclusion regarding its

 minor contributor “due to insufficient quality and/or quantity.” Eckard’s

 profile did not match the conclusive contributors to either of these fractions.

 2. The internal vaginal swab contained two fractions as well. The sperm

 fraction matched Defendant. The non-sperm fraction was consistent with

 a mixture of two contributors. Dr. Wilson matched C.C. with the

 predominant contributor, but again could make no conclusion regarding its

 minor contributor “due to insufficient quality and/or quantity.” Eckard’s

 profile did not match either of these fractions.

 3. A cutting from C.C.’s underpants was tested and, again, the results found

 sperm and non-sperm fractions. The sperm fraction was consistent with a

 mixture of two contributors. The predominant contributor matched

 - 21 -
 STATE V. PHILLIPS

 Opinion of the Court

 Defendant, and the other contributor was consistent with C.C. The non-

 sperm fraction matched C.C.

 4. The tank top Defendant gave to C.C. was tested and also found to contain

 sperm and non-sperm fractions. The sperm fraction matched Defendant.

 The non-sperm fraction was consistent with a mixture of two contributors.

 The predominant contributor matched Defendant, but no conclusion could

 be made regarding the minor contributor “due to insufficient quality and/or

 quantity.”

 5. The external genitalia swab, which is at issue in this appeal, contained no

 sperm and was interpreted as a mixture of three contributors. Dr. Wilson

 presumed C.C. was one of the major contributors, and the other major

 contributor was consistent with Defendant. The minor contributor profile

 to this mixture was inconclusive, but Dr. Wilson was erroneously instructed

 at trial to compare the specific alleles between it and Eckard’s profile.

 Dr. Wilson was able to compare Eckard’s profile with each of the conclusive

contributors’ in each sample and it did not match any.

 In summary: Dr. Wilson analyzed five DNA samples, four of which contain

mixtures of two contributors and one which contains a mixture of three. Defendant

is matched to or consistent with at least one contribution in each of the five samples.

C.C. is matched or consistent with at least one contribution in each, except for the

 - 22 -
 STATE V. PHILLIPS

 Opinion of the Court

tank top. Eckard did not match any of the conclusive contributor profiles. Only one

sample, the underpants, does not contain an inconclusive contributor; the other four

all have an inconclusive contributor in at least one fraction.

 The State argues Defendant’s theory of the case does not match the other four

samples and other physical evidence and asserts his testimony does not explain how

his DNA ended up in the rectal swab. Defendant’s testimony was merely that he saw

Eckard’s “face and her hands” between C.C.’s legs, and that he observed Eckard’s

“finger inside” C.C. Although nothing about this testimony explicitly implicates the

vaginal or rectal swabs, nothing about this testimony precludes them either.

 We also note several inconsistencies in evidence between Defendant’s initial

interview with investigators and his subsequent trial testimony. Defendant’s initial

version of the events barely resembles his trial testimony. In addition to his initial

denials that C.C. and Eckard were inside his apartment or that he knew C.C. was a

minor, Defendant also made no mention whatsoever of any sexual contact between

any of the three individuals and told the investigator he would “absolutely not” find

his DNA in C.C.’s rape kit. Defendant’s testimony at trial changed from his initial

interview after learning his DNA was present.

 However, these inconsistencies in Defendant’s versions of events, as well as

the inconsistencies between all three witnesses’ statements and testimonies, speak

to the witnesses’ credibility, issues that solely rest within the province of the jury.

 - 23 -
 STATE V. PHILLIPS

 Opinion of the Court

“The jury is the lie detector in the courtroom and is the only proper entity to perform

the ultimate function of every trial -- determination of the truth.” State v. Kim, 318

N.C. 614, 621, 350 S.E.2d 347, 351 (1986) (citations omitted).

 While these inconsistencies are relevant for our review of potential prejudice

to Defendant, we cannot conclude the witnesses’ testimony in this case is

overwhelming evidence of guilt to exclude the reasonable possibility that, had the

error in question not been committed, a different result would have been reached at

the trial.

 The State also points to other, uncontroverted and properly admitted physical

evidence, namely that C.C. immediately presented at the hospital with red and

painful inner thighs, when she was examined after the events in question.

Undoubtedly, something occurred that night at Defendant’s apartment, which C.C.

reported immediately to her mother upon returning home. The uncontroverted and

admitted physical evidence in this case shows that C.C. had bruised and red thighs

following the events in question, that DNA matching or consistent with Defendant’s

profile was present in several internal swabs taken from C.C., and that at least one

of those DNA swabs showed the presence of a third person other than Defendant or

C.C.

 The State’s likely, and also admitted, objective in presenting the challenged

testimony regarding the presence and identity of the minor contributor’s alleles

 - 24 -
 STATE V. PHILLIPS

 Opinion of the Court

during its case-in-chief was to anticipate and undercut a key fact in Defendant’s

defense of the case. A third DNA contributor present in the external genitalia swab

raises the possibility that Eckard was the means by which his DNA was transferred

to and found on the swabs taken from C.C.’s body. The prosecutor admitted his

purpose to the trial court in the voir dire: “you know in the last trial [Defendant’s

counsel] argued with the samples that were inconclusive that this could possibly be

Justine Eckard.” If the State had not insisted on preemptively forcing Dr. Wilson to

state the unscientific and reluctant testimony that allowed the jury to more easily

infer Eckard could not have been the minor contributor, a reasonable possibility

existed a jury would have reached a different result at trial.

 The prosecutor’s stated objective demonstrates this reasonable possibility. At

the first trial, Defendant argued the evidence of a third, inconclusive DNA

contributor. The previous jury acquitted Defendant on numerous related charges and

could not reach a unanimous verdict to convict Defendant on this charge. A different

result was reasonably possible without the erroneous admission of this testimony.

 The State’s cases cited to argue the error was not prejudicial are unpersuasive.

The issues in State v. Williams, 190 N.C. App. 173, 660 S.E.2d 200 (2008), also dealt

with rape kit DNA analysis, but in the context of improper closing arguments, rather

than improper admission of prejudicial expert testimony. Id. at 175, 660 S.E.2d at

202. Two other cases the State cites dealt with challenges to the admission of expert

 - 25 -
 STATE V. PHILLIPS

 Opinion of the Court

testimony. State v. Trogdon, 216 N.C. App. 15, 715 S.E.2d 635 (2011) (challenge to

bite mark analysis); State v. Berry, 143 N.C. App. 187, 546 S.E.2d 145 (2001)

(challenge to barefoot impression analysis). In both cases this Court held the “error

was harmless where the testimony was merely corroborative of other evidence.” Id.

at 206, 546 S.E.2d at 158; see also Trogdon, 216 N.C. App. at 24–25, 715 S.E.2d at

641.

 Here, the challenged and improper testimony is not “merely corroborative of

other evidence”; it potentially discredits evidence that supports Defendant’s defense

and theory of the case. While the State presented other evidence tending to show

Defendant’s guilt than just this DNA evidence, the testimony regarding the minor

contributor’s alleles was more than merely corroborative of the State’s other evidence.

 This evidence called into question the very inference that Eckard purportedly

transferred Defendant’s DNA to C.C., which Defendant’s defense reasonably relied

upon. Although Trogdon, Berry, and other cases show how errors in the admission of

expert testimony can be nonprejudicial, where there is additional inculpatory

evidence, the facts and testimony here deals instead with the erroneous admission of

expert testimony that both purposefully anticipates and undercuts potentially-

exculpatory evidence.

 Our Supreme Court has recognized “the heightened credence juries tend to

give scientific evidence” in the specific context of erroneous admissions of expert

 - 26 -
 STATE V. PHILLIPS

 Opinion of the Court

testimony. State v. Helms, 348 N.C. 578, 583, 504 S.E.2d 293, 296 (1998). This

“heightened credence” may be especially true concerning testimony where the expert

herself repeatedly warns of jury confusion if presented. Id.

 Dr. Wilson went to great lengths to emphasize she did not “want [the jury] to

think that just because three [of the six] alleles are not the same that it’s an exclusion

[of Eckard] because it’s not. I know like it sounds like it would be and it’s a hard

concept to understand, but it’s not an exclusion and it’s also not inclusion.” She

further explained, “with sampling, meaning if I run this sample several times, the

three results that don’t match could pop up and match.”

 The erroneously-admitted evidence was insisted upon by the State to allow the

jury to make an inference that these results discredited Defendant’s theory of the

case. Dr. Wilson’s testimony also suggests the evidence itself was of such insufficient

quality that the specific alleles the prosecutor wanted the jury to hear, that were not

attributable to Eckard, could have been different had the quality of the sample been

sufficient for analysis.

 “The evidence presented at trial was clearly sufficient to send the case to the

jury and to support a jury finding of guilty . . . . However, that is not the question

before us. The question is not one of sufficiency of the evidence to support the jury

verdict.” Helms, 348 N.C. at 583, 504 S.E.2d at 296. The question on prejudicial error

is whether, “had the error in question not been committed, a reasonable possibility

 - 27 -
 STATE V. PHILLIPS

 Opinion of the Court

exists that a different result would have been reached at trial.” Id. We conclude such

a reasonable possibility of a different result does exist in this case. Defendant was

prejudiced by the erroneous admission of the challenged testimony. This prejudice is

not overcome by the State’s other evidence tending to show Defendant’s guilt.

 VII. Conclusion

 Defendant’s objection before the jury to the admission of Dr. Wilson’s testimony

regarding the alleles of the minor contributor was properly preserved. This testimony

consisted of expert opinion testimony that is within the scope and requirements of

Rule 702(a). The challenged testimony was neither based upon sufficient facts or

data nor is the product of reliable scientific principles and methods. We all agree the

trial court erred in allowing and admitting this testimony which prejudiced

Defendant. The majority of us agree this admission also violates Rule 702(a).

 The erroneous admission of the testimony was more than mere corroboration

of the State’s other evidence. It anticipated, pre-empted, and potentially discredited

evidence that corroborated Defendant’s anticipated theory of the case. It was not

offered in rebuttal.

 A reasonable possibility exists that, had the erroneous testimony not been

admitted, a different result would have been reached at trial. Defendant was

prejudiced by the erroneous admission of this testimony. We reverse and remand for

a new trial. It is so ordered.

 - 28 -
 STATE V. PHILLIPS

 Opinion of the Court

NEW TRIAL.

Judge COLLINS concurs.

Judge DILLON dissents with separate opinion.

 -2-
 No. COA19-372 – State v. Phillips

 DILLON, Judge, dissenting.

 For each of the reasons stated below, I conclude that Defendant received a fair

trial, free from reversible error. Accordingly, I respectfully dissent.

 I. Factual Background

 Defendant was convicted of statutory rape of C.C., a 13-year old girl.

 The State’s evidence at trial tended to show that Defendant had C.C. and a 21-

year old named Justine over to his apartment to smoke marijuana. After a while,

Justine left, and C.C. stayed to smoke more marijuana. Defendant then engaged in

multiple sex acts with C.C. C.C. left and reported the assault to her mother.

Defendant told an investigator that he did see C.C. and Justine on the night in

question, but that they never entered his apartment. Defendant’s DNA was found

inside C.C.’s vagina and anus as well as on her body.

 In his defense, Defendant testified at trial, contradicting much of what he had

told the investigator. He explained how his DNA came to be found inside of and on

C.C. He admitted that C.C. and Justine did come back to his apartment but that he

engaged in a sexual act only with Justine, with her consent, an act which caused him

to ejaculate. He then went into his bathroom. When he came back out, he saw

Justine performing a sex act on C.C., during which his DNA wound up on and inside

of C.C.

 II. Testimony Challenged on Appeal
 STATE V. PHILLIPS

 DILLON, J., dissenting

 On appeal, Defendant challenges certain testimony from the State’s DNA

expert, which he claims was inadmissible but likely was construed by the jury as an

attack on his version of the events.

 A. DNA Expert’s Preliminary Testimony

 During the trial, the DNA expert testified concerning: (1) the methodology in

matching DNA found on a victim against the DNA of a suspect and (2) her conclusions

about the DNA found on the swabs taken from C.C.’s body.

 Each swab taken from C.C. contained samples from more than one DNA

profile; that is, each swab contained DNA from more than one contributor.

 Whether a DNA profile contained on a swab can be matched against the DNA

of a known person depends on the completeness of the sample. If the sample is

complete enough, then enough “markers” from the sample can be compared with the

DNA of a known person to determine whether or not there is a match. However, if

the sample is not complete enough, that is, if there are not enough markers detectable

from the sample, then there is no attempt to try and match the sample with the DNA

of a known person, as any such attempt would be scientifically unreliable.

 The swabs from inside C.C.’s vaginal and rectal areas and from the exterior of

C.C.’s genital area all contained sufficient amounts of DNA from two different profiles

to test for a match. One DNA profile found on all the swabs matched a sample of

 2
 STATE V. PHILLIPS

 DILLON, J., dissenting

C.C.’s own DNA. The other DNA profile found on all the swabs matched Defendant’s

DNA.

 A sample from a third DNA profile, that is, the DNA from a third source, was

found on a swab taken from outside C.C.’s genital area, though this DNA profile was

not found on the swabs taken from inside C.C.’s vaginal or rectal areas. This third

profile sample, however, was not complete enough such that it could be scientifically

determined whether or not the DNA matched that of Justine or anyone else.

Specifically, this sample only contained six markers which could be compared with

markers from the DNA of a known person, not enough to be able to determine

someone as a match.

 The State’s DNA expert explained that she did not try to match the third DNA

profile with that of Justine, because, with only six markers, the sample was simply

too small to make any scientifically reliable determination. She explained that she

could, if compelled, try to match the six markers with that of Justine, but the

potential matches would be scientifically insignificant since the sample was not large

enough.

 B. Defendant’s Objection

 The State asked the DNA expert if she could state how many of the six markers

from the third DNA profile matched the six markers taken from Justine’s known

sample. It seems that the State wanted its expert to say that not all of the markers

 3
 STATE V. PHILLIPS

 DILLON, J., dissenting

were a match so as to cast doubt on Defendant’s theory that the third DNA profile

could possibly be that of Justine.

 Defendant’s counsel objected, not knowing exactly what information the State

was trying to elicit. The trial court sent the jury out and allowed a voir dire of the

DNA expert to be conducted. After conducting the voir dire, it became evident that

the DNA expert would state that three markers matched that of Justine, and three

did not, but that these results were scientifically insignificant. The State did not ask

the DNA expert for her opinion regarding whether or not she thought the profile

matched that of Justine.

 In any event, the trial judge ruled that the testimony was admissible. The jury

was called back in; the State elicited the testimony that three of the six markers taken

from C.C.’s body matched three of the six markers taken from Justine’s DNA, but

that there was no match as to the other three markers. The DNA expert also testified

that the sample was too small for an opinion to be given as to whether Justine could

be included or excluded as the contributor of the third DNA profile sample.

Defendant’s attorney never objected after the jury came back in following the voir

dire.

 III. Argument

 I agree with the majority that the DNA expert’s testimony was improperly

admitted. However, I conclude that the error in admitting the testimony did not

 4
 STATE V. PHILLIPS

 DILLON, J., dissenting

constitute reversible error. I so conclude for three independent reasons, each stated

below.

 A. Defendant’s Failure to Object on the Right Grounds-No Plain Error

 Defendant concedes that he objected based on Rule 702, that the DNA’s expert

was not scientifically reliable, but not based on Rule 402, that the evidence was

irrelevant, or on Rule 403, that the evidence was unduly prejudicial.

 I conclude that the testimony actually elicited did not violate Rule 702, as it

was scientifically accurate. North Carolina is now a Daubert state. State v. McGrady,

368 N.C. 880, 787 S.E.2d 1 (2016). As such, Rule 702 prohibits expert testimony

unless the testimony satisfies all three prongs of Rule 702(a), that:

 (1) The testimony is based upon sufficient facts or data.

 (2) The testimony is the product of reliable principles and methods.

 (3) The witness has applied the principles and methods reliably to the facts of
 the case.

Id. at 887, 787 S.E.2d at 7 (quoting N.C. Gen. Stat. § 8C-1, Rule 702(a) (2011)). An

expert may testify “in the form of an opinion, or otherwise” if “scientific, technical or

other specialized knowledge will assist the trier of fact to understand the evidence or

to determine a fact in issue[.]” Id.

 Significantly, here, the DNA expert was never asked to provide an opinion

about whether the third DNA profile matched that of Justine. Had she done so, she

 5
 STATE V. PHILLIPS

 DILLON, J., dissenting

would have violated Rule 702, as she admitted that it is widely accepted that a match

cannot be made based on such a small sample.

 Rather, she was only asked whether any of the six markers from the sample

matched the six markers from Justine’s DNA. There is no indication that she did not

have the expertise to compare the markers that she had in front of her or that her

answers were not scientifically reliable on this narrow point. And, she further

explained that these results were variable, as another sample from Justine’s DNA

could produce different results and as the sample from the swab was simply too small

to make any reliable conclusions. I am confident that her answers, opinions, and

explanation were scientifically accurate.

 However, though her testimony was scientifically accurate, her testimony on

this point was irrelevant. What difference does it make how many markers matched?

Any answer would not tend to prove or disprove whether the DNA on the swab

matched that of Justine. Therefore, it should not have been allowed under Rule 402.

 Further, though her testimony was scientifically accurate, it was unduly

prejudicial. That is, though she explained the unreliability of three markers not

matching Justine’s DNA, it is possible that the jury took that to mean that the DNA

must not have belonged to Justine. Creating this impression was the reason the State

wanted the testimony admitted. Therefore, the testimony should not have been

allowed under Rule 403.

 6
 STATE V. PHILLIPS

 DILLON, J., dissenting

 However, since Defendant did not base his objection on Rule 402 or 403, but

only on Rule 702, his objection is not preserved. We, therefore, only review for plain

error. And, here, because there was substantial evidence of Defendant’s guilt; e.g.,

his DNA found inside of C.C. and C.C.’s testimony, any error by allowing the expert’s

testimony did not rise to the level of plain error.

 B. Defendant’s Failure to Object After Voir Dire-No Plain Error

 Even if Defendant’s objection based on Rule 702 was proper, he failed to

preserve his objection when he failed to object at the time the testimony was actually

elicited.

 It is well-settled that a defendant who objects during voir dire, outside the

presence of the jury, waives his objection if he fails to object when the evidence is

actually introduced to the jury. See State v. Ray, 364 N.C. 272, 277, 697 S.E.2d 319,

322 (2010). Here, though, Defendant admittedly did lodge an objection in the

presence of the jury when the State started questioning its DNA expert generally

about whether she could match the markers. It is a close question as to whether this

objection “counts.” Defendant admitted when making the objection that he did not

know exactly where the State was going with its questioning, and the State had yet

to ask the DNA expert about whether the six markers matched. Thus, Defendant

needed to object after the voir dire, when the State “actually introduced” its expert

testimony about her comparisons of the six markers. Id.

 7
 STATE V. PHILLIPS

 DILLON, J., dissenting

 C. No Prejudicial Error

 Even if Defendant’s Rule 702 objection was properly preserved, I do not believe

that, based on the overwhelming evidence in this case of Defendant’s guilt, the error

was prejudicial. I do not think it is reasonably possible that the jury reached its

verdict based on the expert’s testimony concerning certain DNA found on a swab from

outside C.C.’s genital area. I believe that the jury convicted Defendant because of its

view of the other evidence. Defendant’s explanation of how his DNA was found on

and inside of C.C. is simply incredible, given that the DNA from the third source was

found only on a swab taken from the external area of C.C.’s genitals and that

Defendant changed his story between the time he spoke with investigators and the

time of trial.

 8